*130*

DET097679

# UNITED STATES DISTRICT COURT
## for the
### EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **Pamela Suzanne Harnden** | ) |
| | ) |
| Plaintiffs | ) |
| | |
| v. | Case:2:16-cv-13906 |
| | Judge: Edmunds, Nancy G. |
| **State of Michigan Department of Human and** | MJ: Stafford, Elizabeth A. |
| **Health Services, William Weston; Joseph Linert,** | Filed: 11-03-2016 At 11:01 AM |
| **Jennifer Hutkowski, Marnie DeBell, Sara** | CMP HARNDEN V. WESTON ET AL (DA) |
| **Meddaugh, Kim Irwin, Chiquita Ford-White,** | ) |
| **Samantha Pietrykowski, Mandy Dalrymple, Amy** | ) |
| **Sherrod, Christina Moses, Jennifer Henderson,** | ) |
| **Melisa Hazen,** all in their official and individual | ) |
| capacities | ) |
| Defendants | ) |
| | ) |

_____

### Kidnapping, Gross Negligence, Civil Rights Violations

PAMELA SUZANNE HARNDEN

8707 Duce Road

Avoca, Michigan 48006

(810) 387-3257

bpharnden@hotmail.com

DATED: November 3, 2016

**Nature of Grievance: Kidnapping, Gross Negligence, Civil Rights Violations**


We (Robert and Pamela Harnden) took our case to the Federal Bureau of Investigation, Macomb County Office, Michigan, on January 11, 2010 with the allegations of kidnapping, perjury and wrong-doing in the court. The allegations arose from continued abuse of our family by Michigan Department of Human Services, Saint Clair County Prosecutor's Office and Saint Clair County 31st Circuit Court. An abuse/neglect case (08-497) was opened October 22, 2008 and a concurrent second case (given the same case number: 08-497) was opened January 14, 2010, both cases were closed March 15, 2010. After a brief investigation Agents Russell Warlick and Louis Fischetti substantiated our claims and proceeded to open a case on our behalf then made a referral to the Michigan State Police to conduct an investigation. Michigan State Police Trooper Bethany Kraig contacted Plaintiff PH via phone call on/around February 2, 2010 in response to the FBI's request. Trooper Kraig advised our family to move out of the county for our personal safety and that she was forwarding our case. February 25, 2010 I contacted Michigan Attorney General's Office and was advised to seek local remedies first and if unsuccessful then I was to contact the AG's Office again (audio recording, 25 February 2010, page 3). On March 15, 2010 Saint Clair County Prosecutor Michael Wendling stated that his office was "thick as thieves"

with DHS so there would be obvious bias in any possible investigation (audio recording). Robert met with Michigan State Police Detective Patrick Young on December 2, 2010 to again inquire whether the MSP would be investigating our complaints. Detective Young replied that the MSP would not be investigating as the FBI had an open case, however we should take our complaint to the media if we would like attention to our predicament (audio recording). We compiled the evidences that we possessed to the best of our ability while waiting approximately 17 months to receive a completed trial transcript from Saint Clair County 31st Circuit Court (audio recordings, dated court transcripts), within a few days of receipt and according to the instructions from the State of Michigan AG's website we attempted to file our criminal complaints in person at the Lansing, Michigan office in October 2011. We were denied the ability to leave our complaints however we were advised to send them in the mail. The AG's Office took receipt of our criminal complaints October 31, 2011. On January 9, 2012 we were given our case number: 2011-0031278-A. Unfortunately Division Chief Richard Cunningham denied pursuit of the case on March 1, 2012 citing the involvement of the FBI (audio recording, denial letter). We again went to the FBI on March 6, 2012 to present the evidence that we had followed their directives: pursue local and state remedies first. As the local and state law enforcement agencies refused to investigate we met the Federal requirements and the FBI could take jurisdiction

under the R.I.C.O. act, our case remained open at the FBI until November 12, 2014 when Agent Christenson called to inform us that since the United States Attorney's Office continued to refuse the issuance of warrants for a full investigation and possible arrests, she was obligated to close our case with instruction to contact her if any future issues arise. Due to the gathering and attempted gathering of evidences for criminal charges we were unable to file our civil matters. As the FBI discontinued the pursuit of criminal charges less than two years ago, **we are within all statute of limitations for all civil matters that follow or will be discovered during the commission of this complaint**. According to Supreme Court Justice Thomas:

"Statutes of limitations establish the period of time within which a claimant must bring an action. **As a general matter, a statute of limitations begins to run when the cause of action "accrues"- that is, when "the plaintiff can file suit and obtain relief.**" Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 201 (1997). (Page 4)

And

"Recognizing that Congress generally sets statutory limitations periods to begin when their associated causes of action accrue, **this Court has often construed statutes of limitations to commence when the plaintiff is permitted to file suit.** See, e.g., Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 418 (2005)(Page 15)
(*Heimseshoff v. Hartford,* No. 12-729, United States Supreme Court, Justice Thomas, December 16, 2013) (emphasis added)

"JUSTICE and ACCOUNTABILITY

Civil suits can hold offenders directly accountable to victims.  These suits give victims their 'day in court,' regardless of whether there was a criminal conviction or any prosecution at all."
(*Civil Justice for Victims of Crime,* booklet, page 3, National Crime Victim Bar Association, Washington D.C.)

### Issue of "Governmental Immunity"

## MCL 691.1407 (2)(c) and (8)(a)

(2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency is immune from tort liability for an injury to a person or damage to property caused by the officer, employee, or member while in the course of employment or service or caused by the volunteer while acting on behalf of a governmental agency if <u>all</u> of the following are met:
(c) *The officer*, employee, member or volunteer *conduct does not amount to gross negligence that is the proximate cause of the injury or damage.* (emphasis added)

(8) As used in this section:
(a) "Gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

The evidences of gross negligence will be discussed and compounded throughout this complaint and will be found satisfactory to disqualify the individuals who acted in both their official and individual capacities from any form of "governmental immunity".

Due to the vast amount of information and violations, this Complaint will be compiled per the individual with the violations discussed together and in chronological order. Upon review of this case it will be found that despite the honored position of prosecutor, sheriff detective, sheriff deputy, attorney guardian ad litem, judge, attorney referee and court clerk, all agencies have willingly participated in a conspiracy with the Michigan Department of Human Services (DHS) in an effort to obtain federal funds by the illegal seizure of children. According to research, DHS receives $4,000-$8,000 per child, per month that is listed as a ward of the State- whether temporary or permanent. The methods to obtain this money include kidnapping, lack of due process, extortion, bribery, ransom demands, cruel and unusual punishments and so on. This process cannot exist without the compliance of the court. Every judge, attorney and officer of the law was administered an oath of office in which they pledged to uphold the Constitution and laws which were written to protect the citizens from the overreaching arm of the government therefore no one is able to claim ignorance of said laws. You will read how Michigan Child Protection Law MCL 722.621-638 is intended to protect the families from governmental abuse by implementing a checks and balance system and how that law is completely ignored at every level. As I have not attended college nor law school and have no training in such matters, this Complaint will contain what I believe to be relevant offenses from our

6

personal audio recordings, court documents and documents received from DHS. You will find that our rights under the 4th, 5th, 6th, 8th, and 14th Amendments were violated in conjunction with other laws. In regard to our personal audio recordings, the FBI deemed them admissible as Michigan has been determined to be a one-party state. As the recording device was on our person and we were a part of the conversation the recordings were not deemed as eavesdropping.

## Background

Sunday, October 19, 2008 was a normal day at our home. We had three biological sons (Bobby-15, Darren- 13, and Nathan- 11), two adopted daughters (Nicole from Alabama- 13, Sara- 7 from Kharkov, Ukraine) and three foster-to-adopt children from Indiana (11, 9, 8). My husband, Bob and Bobby had gone to Troy, Michigan to get caught up with work, they returned home around 3:30 pm. Shortly before this time Bob's dad came over to work with him, Bobby and Darren as they were fixing the corn picker. Nathan, Nicole, Sara and the other three children were playing outside by riding their bikes, in the sandbox and playing football. While playing football Nicole jammed her left ring finger in an attempt to make a catch. This story was told to the guys at the barn by Sara when she was sent there for a time-out. After a while Nicole's behavior was getting out of control so she came into the house with me. She did not mention that her finger was hurt, she was just upset with life. I spoke with her and she went back outside

7

to play while I finished cooking dinner.  The rest of the day went on as usual:
dinner, relax, showers, bedtime.

Monday, October 20, 2008 was the beginning of a 17 month nightmare.
Two Saint Clair County DHS **license workers,** Marnie DeBell and Jennifer
Hutkowski, went to Frostick Elementary (in Sanilac County) to interrogate the
three children under the age of 10.  They did not possess any legal authority for
this visit.  Sara had never been a foster child and the other two children were wards
of Dubois County, Indiana.  To this day DHS has not admitted why these two
license workers were dispatched to the school, however upon reading their notes
from the seizure of information it seems as if they were trying to imply that I was
withholding food from (starving) the children however the notes demonstrate that
the three children all felt they were fed enough food.  In fact, our pediatrician was
satisfied with the progress the Indiana children were making in our home.  The
year prior to placement in our home, the children had not gained any weight nor
grown taller and they looked sickly.  In the few months with our family they were
looking healthier, gaining healthy weight and growing.  Then it is recorded that
Sara said Bobby hit her with a metal rod.  It is for this reason that we believe DHS
Hutkowski was the reporting person that brought CPS Joseph Linert and DHS
DeBell to our home later that afternoon.  CPS Linert pushed his way past me at the
door demanding to speak with the children- alone.  An officer of the law was not

present, there was not an open case against our family, and CPS did not have a

warrant.  When asked why they were there I was informed that he would tell me

when he figured it out.  Yes, you read that right, he did not have an official reason

to be at our home.

      After speaking with the children alone, he determined that Nicole would be

his main victim.  First a little background on Nicole.  She was in the State of

Alabama foster system from age 8 until she came to our home at age 13.  She

would go between foster home and psychological wards at her will.  Despite the

Alabama workers saying she was not medicated, she was on medications that were

strong enough to sedate a horse.  She was in special education and therapy in

Alabama.  After she was placed with us, we worked with our pediatrician to wean

her off of the medication, she was placed in mainstream classes where she learned

to read and within a few months was earning A's and B's of her own accord.  We

thought Nicole was finally bonding with our family however she was just waiting

for an opportunity to get out.  Stability was not normal to her.  When CPS Linert

gave preference to her and her lies, she was empowered.  This is where the story of

the "motivational stick" started.  No one had heard of such a thing prior to CPS

Linert's arrival at our home and his speaking with Nicole.  This alleged stick was a

pitch fork handle that was missing the fork, so it was at least four feet long.  Nicole

had accused Bobby of hitting her with it in our breezeway.  The breezeway has

about four feet by six feet of open space, therefore any reasonable person can deduce that it was physically impossible for such an action.  Besides, if you are hit with a pitchfork handle you would have more bruising than the one that is on the top of your hand between the two knuckles where a wedding ring would be.

Needless to say, with dollar signs flashing in his eyes, CPS Linert ordered me to take the five adopted/foster kids and Bobby (there may be an arrest) to the hospital for a well-child check.  At this point it should be noted that all eight of our children had regular physicals with their pediatrician/doctor, were observed by mandatory reporters 5-7 days a week and social workers were in our home at least once a month.  If there were any issues or concerns there would have been reports, but no reports were ever filed.  In fact DHS DeBell had just found our home to be in compliance with foster policies on/about August 28, 2008, that was two months previous.

As he was driving to the hospital, CPS Linert called the Sheriff Department for the possible arrest of our son.  The girls were all put in one observation room with me, and the two foster boys were in a room with Bob.  Bobby remained in the waiting room of Port Huron Hospital.  After speaking with Nicole, Bobby and me [as I kept saying that Nicole (13) was lying, Sheriff Deputy Randal Gobeyn asked Nicole if she would like me to leave so he ordered me to leave the area while he spoke with her] and at the request of CPS Linert, Deputy Gobeyn arrested Bobby

for domestic violence/aggravated assault against his sister.  As his parents we did not grant permission for this arrest.

The children were examined by Physician Assistant Brenda Leverenz.  No treatments were rendered to any child and all children were discharged home. Despite the findings of the Physician Assistant and without court orders or any form of legal authority, CPS Linert proceeded: to have the Indiana children removed from our care and sent to another foster home without the permission of Indiana; he signed some of the discharge papers; he ordered Bobby's arrest; he demanded that we take Nicole to a friend's house for the night as he would not allow any type of relative placement; he sent Sara home stating that she was safe.

## Kidnapping

### 18 U.S. Code § 1201- Kidnapping

(a) **Whoever unlawfully seizes**, **confines**, inveigles, decoys, **kidnaps**, **abducts**, or **carries away** and ***holds for ransom*** or reward or otherwise any person, except in the case of a  minor by the parent thereof, when- (emphasis added)

### 18 U.S. Code § 3299- No statute of limitations

Notwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any offense under section 1201 involving a minor victim, and for any felony under chapter 109A, 110 (except for section[1] 2257 and 2257A), or 117, or section 1591.

**Counts One, Two and Three:** Foster-to-adopt children from Indiana: SD (11), DD (9), KD (8)

The sibling group was placed in our home on/about May 31, 2008 for a mandatory six month "trial" period. The intention of this time is to live together as a "family" prior to the finalization of an adoption in an effort to be sure that the blending will work. Generally within the six months the "true nature" of all parties is exposed and there is ample time to determine if the adoption should take place. This process is in place in an attempt to minimize failed adoptions.

After only being in our home for a month and a half the Indiana children trusted us enough to disclose that they had been sexually abused by the foster home in Terre Haute, Indiana from whence they came. We made a video of their confessions and notified their social worker in Dubois County, Indiana and we also notified the courtesy worker in Saint Clair County, Michigan. Unfortunately, after the pediatrician verified that there was sexual abuse and a 3200 was filed, Saint Clair County Department of Human Services (DHS) Supervisor Kim Irwin denied the 3200 in August 2008 stating that the children were in a good home now (Plaintiff's home). This unfortunate decision meant that the alleged perpetrators would neither be investigated nor face criminal charges.

After the original FBI agents substantiated the kidnapping charges, they requested a copy of the video and had the sexual abuse specialist view the disc.

She subsequently went to Indiana to be sure that the alleged perpetrators were no longer licensed to provide foster care.

In our home the children were in regular attendance with church members, teachers, pediatrician, therapists, teachers, school staff and social workers. All of these persons are mandatory reports of child abuse under Michigan State Law 722.623. If at any time there were concerns of abuse by the Plaintiffs a reasonable person would assume that a report would have been made. A reasonable person would then assume that since no mandatory reporters filed any reports after extensive, daily contact the children were NOT being abused in the foster-to-adopt placement. In fact, the front page of the CPS report states "**No current injuries have been observed** but it is reported that there have been injuries in the past."

- October 1, 2008 Judge William E. Weikert, Dubois County Circuit Court, issued a court order to us:

"The Court, being duly advised, has previously Ordered that S, D and K D be placed in the foster home of Robert and Pamela Harnden in Avoca, Michigan. Robert and Pamela Harnden may sign all documents necessary for all psychological/educational/medical testing of the children."

- Monday, October 20, 2008
  - Saint Clair County Foster license worker Marnie DeBell and Adoption license worker Jennifer Hutkowski went to Frostick Elementary School in Sanilac County, Michigan to interrogate the

minor children Sara, DD and KD for alleged withholding of food by Plaintiff.

o Indiana had full jurisdiction of DD and KD.

o Megan Olds was the legal social worker for the children in Dubois County, Indiana and had visited the all three children in their respective schools when she saw them during her September 2008 visit.

o Foster worker Mandy Dalrymple was the courtesy worker in Saint Clair County.  DHS Dalrymple conducted her courtesy visits at our home in Saint Clair County, in the months that Ms. Olds did not fly up for her visit.  Reports were written and signed in our home after each visit.  Contrary to policy these reports were not supplied to the parents.

   ▪ On August 25, 2008 License worker DeBell and DHS Dalrymple had a combined visit/investigation into an occurrence with SD.  Both workers found our home to be *IN* compliance with foster license rules.

   ▪ On October 2, 2008 we participated in Individual Educational Plans (IEP) for both DD and KD at Frostick Elementary.  They were to be monitored in their current educational position with

another meeting to be scheduled in 30 days for a follow-up.
Judge Weikert issued the order to the foster parents in order for
them to have legal authority in such matters.  The issuance of
this order also proves the trust placed in the parents by the
Indiana social workers.

o That evening (Monday, October 20, 2008) Foster License DeBell and
CPS Linert arrived at our home and pushed their way in through the
front door.  An explanation was not given as to why they were here.

o Indiana was not notified of this visit.

o After CPS Linert interrogated all eight children individually and
alone, he allegedly called his supervisor Samantha Pietrykowski for
permission to have Plaintiff take the children to Port Huron Hospital
for a well-child check.

▪ I say allegedly it was his supervisor because during this phone
call CPS Linert was smiling and laughing.  A reasonable person
would assume that if someone is smiling and laughing that they
are not planning a hospital visit or investigation.  A reasonable
person would assume the demeanor of a CPS worker during the
course of an investigation would be solemn, not jovial,
especially if kidnapping is the intended goal.

- o After the well-child check was conducted by Physician Assistant Brenda Leverenz, the hospital records indicate the children were stable and disposed to home. (medical records, page 6)
    - ▪ Also to be noted on the medical records, page 2, CPS Linert signed the hospital release page in addition to Plaintiff. CPS Linert did not have any legal authority to sign this document. Please refer to the language contained in the court order issued by Judge Weikert of Dubois County, Indiana.
    - ▪ Despite DHS having PAC Leverenz alter the medical records to reflect "consistent with abuse" on November 5, 2008, the fact that the same PAC sent the children home was not scrubbed from the record to support this claim.
- o Regardless of the discharge to the Plaintiff's home, CPS Linert had SD, DD, and KD taken to a different foster home from the hospital. There were no court orders or any other legal documents generated to perform this action therefore CPS Linert effectively kidnapped SD, DD, and KD from our home.
- • Tuesday, October 21, 2008
    - o While we were parked in the Juvenile Detention Center lot waiting for Bobby (oldest biological son) to arrive and be released into their care

Robert made a phone call to Supervisor Terri Tigue-Petri of Dubois

County, Indiana to advise her of the situation.

- Ms. Tigue-Petri stated that since the document that DHS sent to

  Indiana reflected the following story that she could discuss the

  case with us:

  - DHS reported that Nicole (adopted daughter, age 13) told

    her teacher that her left ring finger was bruised by Bobby

    hitting her with a stick (pitch fork handle).  She was then

    sent to the counselor's office and a call was made to CPS

    in this regard.  Therefore justifying CPS coming to our

    home.  There is no record of this event in any documents,

    especially in the foster and CPS reports that were

    provided to us by the agency.

  - We informed her that was not true and she asked us if we

    wanted to continue to proceed with the adoption of the

    children.  We asked for a couple of days to think things

    over.  That was agreed too.  We did not find out until we

    called her back that the children were sent back to

    Indiana at the beginning of November and were all to be

institutionalized as we were their last hope to be in a
family.

**Count Four:** Sara Harnden (7)

We traveled to Kharkov, Ukraine and adopted Sara January 17, 2003. She
was 17 months old at the time and in an orphanage since she was two months old.
Sara maintains dual citizenship. Up until the day she was kidnapped, Sara did not
know that she was adopted, we were the only family that she had ever known. She
had grown to love and feel accepted as a member of our family and we were
waiting for the perfect moment to explain to her how she had been chosen by us to
be our child. That moment was stolen from us and can never be replaced. Because
we are a strong family it was determined by a psychologist that Sara does not
require mental health therapy, however this does not negate the fact that CPS
Linert caused serious emotional and mental harm to Sara when after kidnapping
her from school he announced to the strangers with whom he was placing her (he
refused to allow the girls to be in relative care) that they now had a "little Russian
girl". This statement added insult to injury and has caused irreversible damage to
her soul. She still struggles with trusting us and "rejoining" the family at the same
level that existed prior to October 21, 2008 and has a severe fear of being
kidnapped again.

- Monday October 20, 2008

○ On this day, as mentioned above, Saint Clair County Foster license worker DeBell and Adoption license worker Hutkowski went to Frostick Elementary School in Sanilac County without proper legal authorization and interrogated Sara during the regular course of her school day.  The fact that it was licensing that initiated the case and not an actual call-in is verified by Amy Sherrod on August 11, 2009 at a Team Decision Meeting (TDM).  "But initially when this whole thing started it was information that came from um you know, obviously you've seen the report, so it was information that Sara gave to **LICENSING, initially that started the whole ball rolling**." (transcript of audio recording at the 1:21:59 mark)

- ▪ The foster report reflects that all children were consistent in that they were fed appropriately by Plaintiff however Sara allegedly stated that Bobby beat her with a metal rod.

  - • This was outside of the alleged premise for entry into the school (withholding food) and neither DD nor KD substantiated Sara's claims.

  - • This lead to one of these workers, to become the reporting person which then caused CPS Linert and

Foster License DeBell to come to our home late that afternoon.

- These interrogations were conducted during regular business hours which would have allowed ample time for these workers to procure legal documentation from a Sanilac County judge to enter the premise of the school and conduct their abnormal investigation.

- It is not normal protocol for license workers to conduct their own, unwarranted investigations.  Such "investigations" are generally referred to as "fishing expeditions".  They are to investigate the family and home as a whole as to whether or not they are in compliance with foster/adoption rules and regulations.

- Sara was not granted her rights to have representation from the Ukrainian Consulate Office (UCO).

- That evening, CPS Linert interrogated Sara alone in her room.

- Plaintiff was required to take Sara to PHH for a well-child check.

  - Sara's medical records were not altered to reflect "consistent with abuse."

- Page 3 of her medical records indicate "no bruising noted".

- Page 6 also indicated that Sara was to go home and was in stable condition.

- CPS Linert sent Sara home with her parents stating that she was safe.

- Tuesday, October 21, 2008

  o Sara went to school per her normal routine.

  o During the course of the day, during normal business hours, Saint Clair County CPS Joseph Linert allegedly obtained a pick up order from Saint Clair County 31st Circuit Court, signed by Judge Tomlinson and initialed by Attorney Referee Peter Shane Burleigh. Frostick Elementary School is in Sanilac County and not a signing party to the Saint Clair County Special Victims Investigative Protocol.

    - After sending Sara home because she was safe, CPS Linert stated to the court that the reason he was seeking care and supervision was because of "physical abuse by the parents" (page one).

- Page one also has a curious fact: a case number, 08-0497 N. This is curious because a petition had not been filed as of this date nor had there been any court hearings or investigations, how can there be a case number prior to court?  A reasonable person would start to theorize that DHS and its employees had premeditated this case against our family and/or the warrant did not exist until after the initial court hearing two days later.

- This order also only names our two adopted daughters, not our three biological sons.  (page one)

- On page 2, item 7 is mysteriously left blank.  Line 7 reads as follows: "To effect this order you are authorized to enter the premises located at:"

  - By leaving this line empty, this Order to take children into protective custody is an unlawful document thereby it does not grant anyone any authority to take custody of any child.

- On page three the only information that was supplied in the "Identifying Information" section was the names and birthdates of the girls and Plaintiff's address and phone number.

  - The Fourth Amendment is very specific:

22

> "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and **particularly describing** the place to be searched, and **the persons or things to be seized**." (emphasis added)

- Sara was kept from boarding the bus per her normal routine and was held hostage in the school until CPS Linert arrived. His alleged arrival time was 3:40 pm.

  o Sara's school file does not contain any record of this removal.

  o The school employees did not know the names of the "guy and girl" that took custody of Sara from their premises.

  o An officer of the law was not present during the seizure.

  o Sara was normally home from the bus ride by 4:15 pm. When she did not show up at home we panicked.

    ▪ After calling the bus garage and being informed that Sara was not on the bus, I called the Superintendent's Office asking if they could find out where our daughter was. The woman who answered the phone, Mrs. Hupenbecker, took my information and called then Principle Julie Western. She then called me with the information that a girl and guy took Sara.

- During a meeting with then Superintendent Dr. Kevin Miller on November 3, 2008, when he contacted then Principle Julie Western, she did not know the names of the kidnappers.  She placed a call to DHS to obtain their names and Dr. Miller called me later in the afternoon with this information.  (audio recording, CPS report, pages 3 and 12)

- We found this to be totally appalling.  Two weeks after our daughter was kidnapped from their care, the school employees were still unaware who took her.  It also speaks to the lack of formal protocol employed by the CPS and DHS workers during the execution of the kidnapping.

- CPS Linert did not make contact with me until 5:19 pm as he was allegedly taking our daughters "to a safe foster home".

- The level of panic that one experiences when they do not know where their child is cannot accurately be described.

- We had to purchase a copy of the Order to take Protective Custody from the courthouse on December 11,

2008 as CPS Linert never furnished a copy to us. This fact also makes one wonder if the Order was even produced on the day in question or if it was back dated to make it look official.

As described above and will be discussed in further revelations of this Complaint, it is obvious that our daughter was indeed kidnapped by CPS Linert and Foster License Worker DeBell. This was also substantiated by FBI Agents Russell Warlick and Loius Fischetti in January 2010.

**COUNT FIVE:** Nicole (13)

As an overseas adoption was very expensive we decided to pursue a domestic adoption. For the subsequent placements DHS acted as our adoption facilitator. They conducted the home studies and assisted in finding potential matches for our family. Jennifer Hutkowski was our adoption worker from the beginning of our time with DHS. In the fall of 2006 we travelled to Birmingham, Alabama to have a family visit with Nicole prior to placement in our home for adoption. Nicole was eventually adopted by us in May 2007 here in Saint Clair County 31st Circuit Court with Judge Elwood Brown officiating. It was reported to us by the State of Alabama social workers that Nicole had been in the same placement for almost a year and was not on any medications. This was taken into serious consideration while deciding if she would be a good fit in our family.

After we had decided to pursue the adoption and Nicole was brought to Michigan by her workers, it was revealed to us that the opposite was true: Nicole alternated between foster homes and psychiatric wards from age 8 to the age of 13 when placed with us and she was very heavily medicated. Now, the medications were hidden from us until after placement. During the home visit the Alabama workers did not leave the medications for administration. Nicole was in the fifth grade however she functioned below grade level and received special education in Alabama. Within a few months of placement Nicole had learned to read and was progressing very rapidly in school. After she started sixth grade that fall she was receiving A's and B's in mainstream classes. She maintained these good grades as long as she was in our home. This type of accomplishment is only obtained when a child feels safe in their environment. Just as with the rest of the children in the home, Nicole had daily inter-reactions with multiple people who were mandatory reporters with no concerns ever voiced by any of them. In fact, most of the people would relay praise to us for her good behavior and would say how she put forth great effort to achieve in class.

- Monday, October 20, 2008
  - Nicole did not speak to any social worker at the school or counselor as reported to Indiana by DHS.

- Nicole was the main "witness" that CPS Linert spoke with at our home during his interrogations, which were conducted without witnesses as DHS DeBell remained seated at the dining table during the entire course of the visit.

    - CPS Linert would speak with Nicole, go speak with a different child, back with Nicole, and so forth.

    - The only time I was spoken to that night was for less than two minutes by CPS Linert.  He pulled me into the living room and asked me about Nicole and her history.  I advised how she likes to lie in order to gain her desires and that she had 13 placements in a few years.  He thanked me and continued his plan.

    - Despite Nicole becoming the main accuser in the abuse/neglect case, she never testified at our trial.

- During the well-child check at PHH, Sheriff Deputy Randal Gobeyn questioned Nicole in regard to a single bruise that she had on her left ring finger, between the two knuckles where a wedding ring would be.

    - After I continued to tell the Deputy that she was lying, he asked her if she would like me to leave the area, of

course she said yes I was then asked to leave the hall and
return to the exam room while the Deputy continued to
speak with Nicole (13 years old).

- Nicole did not see a physician and was not given any
  medical treatments (x-rays, splints, order for check-up,
  etc.).

- Nicole was released to her parents per the hospital
  discharge records, however CPS Linert signed her release
  papers without a court order or any form of jurisdiction
  or warrant.  (medical records)

- The medical records were altered on November 5, 2008
  by Physician Assistant Brenda Leverenz to say
  "consistent with abuse" when asked to by DHS.
  However, at trial and under oath, PAC Leverenz stated
  that the finger injury was consistent with abuse.  (trial
  transcript, page 42, line 13)

- While standing in the lobby of PHH, DHS DeBell, whose
  family had adopted/fostered many children, told me that
  her brother did not "snap out of it until he was 31"- she
  was referring to Nicole's manipulative behaviors and

lies.  This suggests that DHS was very much aware from the very beginning that their whole case was a lie.

- Comments were made by Supervisor Chiquita Ford-White during a TDM on June 24, 2009: "Honestly it doesn't matter.  It doesn't matter if she did or didn't." (TDM transcript, page 47); "'Cause we don't care if she lied or not." (page 48);

- CPS Linert told us that we had to take Nicole to a friend's house for the night and refused to let us take her to any relatives.  He did not want her taken to Robert's brother's home in Macomb Township because that was too far for him to drive.

  - This also suggests a premeditation to the kidnapping of Nicole.

- Robert drove Nicole to a friend's home from the hospital.

  - During this car ride Nicole continued to bang her head on the window stating that if she would have known the outcome of the night she wouldn't have lied.

- o She expected to be taken away from us that very night.

- o This also supports the premeditation theory.

- Tuesday, October 21, 2008

  - o After kidnapping Sara from the school, CPS Linert kidnapped Nicole from the home that he instructed us to take her to the previous night.

  - o CPS Linert did not notify Plaintiff of the apprehension until 5:19 pm while he was transporting our daughters to a "safe" foster home.

  - o Nicole was never returned to our family after October 20, 2008.

**COUNTS SIX, SEVEN** and **EIGHT:** Robert II [Bobby] (15), Darren (13), Nathan (11)

Bobby, Darren and Nathan are Plaintiff's biological children. All three boys have always succeeded in all of their pursuits and are very independent people. During their school years, they all maintained 4.0 gpa or higher, taking all AP classes that were available to them, they participated in three sports a year and were all a captain of one or more of the teams they were on. They also helped tutor anyone who had trouble in their classes, especially reaching out to teammates who were close to becoming ineligible to play because of their grades. Despite the

difficulties associated with bringing hurt children into our home, our sons opened

their hearts and accepted each and every child into the family, treating them as one

of their own.  Knowing the troubles associated with adoption, at one time or

another prior to DHS abusing our family, each boy had mentioned how when they

grow up they would also bring hurt children into their homes so that one more

child doesn't grow up without a family.  This speaks volumes to their character and

moral values.  Since this time: Bobby has graduated from the University of

Michigan with a major in history, a major in Asian Studies and a certificate in

entrepreneurship; Darren is now a senior at Michigan State University majoring in

physics in the school of engineering where he maintains a 3.9 GPA or higher and

Nathan is a junior at the University of Michigan and will be writing his own major

with a focus in business and math.  Now, I ask you, if this home were an abusive

home, as the post-deprivation reports from DHS suggest, then how have these boys

managed to get back up on their feet and succeed?  At this point do not forget that

DHS **APPROVED** our home for adoptions and visited our home on a monthly

basis, they knew before they started this mess that we were innocent of their lies.

- Despite CPS Linert removing the girls from our family the day after the
  well-child check, the boys remained in our home.  However, according to
  the CPS report on October 31, 2008 CPS Linert called Attorney Referee
  Peter Shane Burleigh requesting that the boys be added to the petition for

removal.  Attorney Referee PSB stated that he needed more evidence to add the boys.

- On November 4, 2008 DHS had a copy of medical records for Nicole, Sara, and the foster-to-adopt children printed at Port Huron Hospital.  There has never been record given that DHS obtained a court order to retrieve said records.  The case was not adjudicated at this time therefore they did not possess the legal authority to obtain the records of our daughters.

- On November 5, 2008 PAC Levernz altered the medical records to reflect "consistent with abuse."

   o  PAC Leverenz testified at our trial on July 21, 2009:

   "I made those indications on 11/5/08, they asked me to summarize my feelings about the injuries." (trial transcript, page 54, lines 6-7)

- November 6, 2008, Pretrial/amended Petition Hearing

   o  CPS Linert requested the Court to accept an amended petition which would now include our biological sons.

   o  The further evidence mentioned to remove our sons from our care was the altered medical records.

   o  The petition was accepted, our boys were ordered removed that day. CPS Linert allowed us to take the boys to their grandparent's home which is next door to ours.  This was only allowed with one condition:

Robert and I had to leave our home.  An order was never issued by the court for this action, it was a demand made solely by CPS Linert.  In order to have as little disruption for the boys as possible we agreed to these terms.  This arrangement allowed for the boys to stay in their school district, unlike the girls who were moved to a different district. So for three weeks, until the mandate was revoked by a new foster worker, we lived approximately 60 miles from home in order for the boys to stay with their grandparents.

- I was allowed to drive home after the boys left for school to take care of the puppy, cattle, woodstove and all other chores as long as I was not home when they got off the bus next door.

- This added stress to the boys as they had to walk home every night to take the puppy out, fill the woodstove and other chores before bed.

- B, D and N all experienced a hiccup in their grades, however they rebounded as they determined to not let their circumstances destroy the rest of their life.

- During our supervised family time at DHS that evening CPS Linert informed us that he did not have a signed pick-up order as of yet but he did have verbal permission therefore we were

still supposed to leave the boys at their grandparents' home that

night.  (audio transcript, page 10)

- According to United States District Court for the Western

  District of Michigan, Southern Division, Judge Gordon J.

  Quist in *Patrick O'Donnell, et al v Susan Brown, et al*,

  case number 5:02-CV-143, opined July 30, 2004, page

  10:

While the aforementioned court rule and statutory provision may authorize the seizure of a child in the circumstances they describe, they do not give the police or anyone else the authority to enter a home to effect the seizure.  State statutes and regulations cannot be construed to displace the protections of the United States Constitution - even when the state acts to protect the welfare of children.  Cf. Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 540-41, 121 S. Ct. 2404, 2414 (2001).

- Further proof that Saint Clair County DHS was aware of

  the proper procedure for removal of children was given

  by Elreta Dodds who was the Director of Saint Clair

  County DHS in 2008 when our case was going through.

  According to Ms. Dodds she had brought attention to the

  illegal removal of children and ordered the practice of

  removing with verbal orders to cease when she became

  Director. However, even after filing complaints with

  DHS headquarters in Lansing, the practice was never

stopped and Ms. Dodds was assigned to Wayne County

DHS.  (audio recording, August 7, 2012, page11)

- November 13, 2008: CPS Linert closed his investigation without

  interviewing Robert Sr. or Pamela Harnden, the respondent parents and

  placed them on the Central Registry.  (Please refer to November 21, 2008 for

  quote.)  Again, the placement on this registry came before trial and without

  an investigation by the Guardian ad Litem or detective in violation of MCL

  722.628(1)(2)(3)(12)(13).

- November 20, 2008: Multiple times during a conversation, CPS Linert

  issued a ransom demand to Plaintiff.  "…you can still plead no contest and

  call for a hearing and pled no contest and that- like I said, you're not

  admitting guilt,…" "… you're not admitting innocence, you're not saying

  anything, you're saying look, we, we just want to work with services and get

  the kids back." (page 4)  "…you can plea no contest.  Which means you're

  not admitting guilt.  You're saying- you're not saying we're guilty, you're

  saying hey, whatever, we don't, we just want the kids back, what do we need

  to do?" (page 5)  "…They can't use the no contest plea against you." (page

  6)  "Um, but those, but make sure just- anything else you understand that

  those are your three options: guilty, not guilty or no contest.  And no contest

  says: ok, forget the trial, let's do the services and get the kids." (page 6)

The following piece of the conversation demonstrates how DHS employs extortion and bribery in order to obtain the plea of no contest they so desperately desire from each of their victims.

JL: So, Sara's (social worker) offering you services already?

PH: We asked.  I asked her what um what we're- what you guys are looking for.  Because, you know, I'm looking at you guys have already had my children for four weeks.  If you guys wanted us in counseling, Ok, I've already been four weeks in to this, we're coming up on Thanksgiving and Christmas.

JL: Right

PH: And my children aren't at home

JL: Right.  And the way we look at it is if you're saying no, not guilty, we don't need anything, then you're in a place where you're refusing to, to do anything with us.  You know, basically, (inaudible) work with us.

PH: Basically being unco-operative

JL: Yeah.  I mean

PH: We're not but

JL: I know you're not you (inaudible) plead not guilty and go to the trial and Sara can start services, if you want.  (pages 6-8)  Other excerpts from this conversation: JL: "And even though you've already put in the plea

of not guilty, um, I've went to trials before and people have said no contest at the trial and they just stop the trial right there. (page 11); PH: Ok, so: no contest stops all trials and we get services and we get our kids back? JL: Right, well, you start working toward, they take temp" (page 12)

- November 21, 2008: CPS Linert admitted that he never interviewed us.

  o RH: Part of your job isn't it to take all the um, take everyone's statement?

  JL: Yes, (inaudible)

  RH: (inaudible) on what happened.

  JL: **I didn't get that chance.  You guys can give me your statements any time you want.**

  o During our first interview by a representative from Saint Clair County DHS on January 20, 2009, worker Amy Sherrod stated: "…I mean, so when you are able to explain those things it looks, you know, different.  So, I mean that's why I wanted to discuss these things with you." (audio transcript, page 113)

  o Just imagine all of the pain, suffering and violations of our rights that our family unnecessarily endured because the CPS worker couldn't find the time from October 20 to November 13, 2008 to have a discussion with the parents as to the events in their home.

- June 24, 2009: DHS Supervisor Chiquita Ford-White admitted that Nicole lied and they weren't giving the girls back because they didn't want to. (audio quoted above)

- October 15, 2009: At the Compliance Conference administered by the Bureau of Children and Adult Licensing worker Kelly Maltby it was stated that we should NOT have lost our kids and we were not found to be in non-compliance on any of the ludicrous charges. (audio)

- January 11, 2010: We went to the FBI and alleged that our children were kidnapped, perjury was committed and there was wrong-doing in the court. Our claims were substantiated and a case was opened on our behalf.

After reading the above it is open and obvious that the Department of Human Services and their employees in both their official and individual capacities kidnapped all eight children that were in Plaintiff's household in October 2008. A reasonable person may even conclude that the kidnapping of our children was premeditated.

The fact that there is no statute of limitations for the criminal aspect of kidnapping would leave one to assume there are no limitations for civil actions as well. It can be argued that because a precedent has not been made in the civil filing regarding kidnapping, it has not been expressly denied either. The argument to establish the lack of precedent could be as follows:

"Plaintiff also alleges kidnapping claims against Defendant (Count III) pursuant to both federal and state law (18 U.S.C. § 1201 and Mich. Comp. Laws 750.349). But the statutes do not confer an express private right of action, and kidnapping statutes have been interpreted as providing no implied private right of action. *See Ali v. Przbyl,* 04-CV-0459E(F), 2004 WL 1682774, at *3 n.1 (W.D.N.Y. July 26, 2004) (establishing that 18 U.S.C. § 1201 does not provide a private right of action and that private individuals have no constitutional right nor standing to file criminal charges against another individual).
(*Brown v. Walsh, case number:* 12-10535)
(Note: *Ali v. Przbyl* could not be found for reference on September 12, 2016.)

Yes, an express private right of action is not written in the laws, however, they

aren't expressly denied either.  In most cases of kidnapping the perpetrators are

arrested, tried and if found guilty, jailed.  However, in our case, after four years of

Agents requesting, the United States' Attorney refused to authorize a full

investigation and arrest warrants leading to the closure of our case thereby denying

our family justice once again.  It is for this reason that kidnapping is included in

this civil proceeding.  If the substantiation of kidnapping is disregarded, false

imprisonment envelopes the same concept and according to MCL 600.5805(2) has

a period of limitations of 2 years.  As our allowed time to file did not start until

November 12, 2014 this Complaint is filed within the statute of limitations.

## Gross Negligence and Civil Rights Violations

In an effort to be less redundant and since the supporting facts are the same, the evidence to remove any immunities the government employees may have enjoyed and the proofs of how our Civil Rights were violated will be presented together. As the amount of information is great, it will be presented in chronological order and as brief, but as descriptive, as possible.

- Monday, October 20, 2008

  - **Saint Clair County <u>Foster license worker</u>** Marnie DeBell and **<u>Adoption license worker</u>** Jennifer Hutkowski go to Frostick Elementary School in Sanilac County to interrogate the three children under the age of 10. They did not, however, interrogate the five children over the age of 10. There were no open complaints against our family and no legal authority was obtained from Sanilac County Courts to enter the premises. A reasonable person who is made aware of this action immediately wonders if this was a premeditated and personal attack on our family by these workers, a "witch hunt" if you will.

- o As the workers can be the "voice" of the child under 10 years old, one of these workers, assumed to be Defendant Hutkowski, then became the "call-in" person for alleged abuse.

  - ▪ It was alleged that Sara claimed that her brother Bobby hit her with a metal rod. The other children at the school did not verify this story.

- o "But initially when this whole thing started it was information that came from um you know, obviously you've seen the report, so it was information that Sara gave to **LICENSING, initially that started the whole ball rolling.**" (Amy Sherrod, CPS Supervisor, audio recording, August 11, 2009)

- Despite the lack of a 3200 being filed, sometime between the illegal interrogations at the school and 5:00 pm, CPS opened a Category 1 case against us. According to MCL 722.628b(1)

If a central registry case involves a child's death, serious physical injury of a child, or sexual abuse or exploitation of a child, the department shall refer the case to the prosecuting attorney for the county in which the child is located. The prosecuting attorney shall review the investigation of the case to determine if the investigation complied with the protocol adopted as required by section 8.

The adopted protocol for the county is known as "Saint Clair County's Special Victims Investigative Protocol". It requires the handling of CPS cases to involve a Coordinated Investigative Team

(CIT).  This team is comprised of a Prosecuting Attorney- team leader,

police investigators, protective service workers, medical professionals

and mental health professionals (when necessary). (Protocol booklet,

page 4)  It also has the objective to minimize trauma to the victim(s) and

to ensure fairness to the accused.  (Protocol booklet, page 4)  As the

county has adopted these protocols and they are mandated by the law and

policy that all team members will be trained in the proper execution of

said procedures, it makes the injuries that have been sustained by our

family that much more grievous.


MCL 722.628d(1)e: Category I- court petition required.  The department
determines that there is evidence of child abuse or child neglect and 1 or more of
the following are true:
- (i)    A court petition is required under another provision of this act.
- (ii)    The child is not safe and a petition for removal is needed.
- (iii)    The department previously classified the case as category II and
the child's family does not voluntarily participate in services.
- (iv)    There is a violation, involving the child, of a crime listed or
described in section 8a(1)(b), (c), (d), or (f) or of child abuse in the
first or second degree as prescribed by section 136b of the
Michigan penal code, 1931 PA 328, MCL 750.136b.

As the front page of the CPS report states: "No current injuries have been observed

but it is reported that there have been injuries in the past."; the children were

discharged by the hospital to home (medical reports); CPS Linert stated that "Sara

was safe", the biological sons were not removed on the first night and that CPS

Linert stated on November 20, 2008: "You guys have housing, you have

employment, you guys have most of the stuff that- you're not typical- you're not the typical people we deal with, you know that. You have all those things. So, **I see your case being mostly the parenting and uh, uh counseling**." it is evidenced that there was not a safety concern for our children and a petition was NOT justified thereby negating the classification of Category I and verifying the persecution of our family.

- Around 5:00 pm, CPS Linert and Foster License DeBell arrived at our home and demanded to question the children. When I asked why they were there Defendant Linert said he would let me know when he found out as he was pushing his way past me into my home. There was neither a warrant nor an officer of the law accompanying the workers.

  o The fact that he had to figure out why they were there further substantiates that the impending attack on our family was premeditated and a fishing expedition was required to move forward.

  o As stated above, Defendant Linert was alone with each child when he interrogated them. Defendant DeBell remained seated at the dining table for the entire duration of their time in our home.

- o Defendant Linert told me to take Bobby, as there may be an arrest, and the adopted/foster children to the hospital for a well-child check. Biological sons Darren and Nathan were allowed to stay home.

- o Please refer to the "Kidnapping" section for most of the events at the hospital.

- o After it was determined by the Physician's Assistant that there were no injuries and no treatments were rendered, Defendant Linert proceeded to have our son, Bobby, arrested for domestic violence/aggravated assault despite every child except Nicole stating that her finger was injured while she played football the previous day and the PAC testifying that the finger injury was consistent with play. No warrants were issued, no detective investigated, all witnesses were not at the hospital to be questioned by the patrol deputy: all legal methods of arrest were ignored. As the injury to Nicole's finger was determined to be from child's play (PAC Levernez, trial transcript, July 21, 2009) and happened the day prior to this hospital visit, imminent danger did not exist and the charges were false. At the request of CPS Linert, Bobby was transported to the Saint

Clair County Juvenile Detention Center for the night pending court.

- We, the parents, did not grant permission for our then 15 year old son to be arrested for an injury that our then 13 year old daughter received playing football with her younger siblings the day before.
- These charges were later dismissed.

- Tuesday, October 21, 2008
  - Please refer to the "Kidnapping" section for the incidents regarding our daughters.
  - On this day Bobby was paraded through the courthouse in jail issued sweat clothing in arm and leg shackles. One would assume that since the charges were a very serious criminal charge, normal protocol would have been followed.
    - The Sheriff Deputy who arrested Bobby the night prior was the bringer of the charges.
    - Defendant Linert was present to assist the Sheriff.
    - A prosecutor did not bring the charges to the court.
    - The charges were brought in Family Court in front of an attorney referee.

- Bobby was released to the care of his parents.

- Wednesday, October 22, 2008

  o A Team Decision Meeting (TDM) was held in the morning.

    - It was apparent at this meeting that nothing we had to say mattered. DHS had a plan to take our children and nothing was going to change that.

  o We had a preliminary hearing in the court of Attorney Referee Peter Shane Burleigh. The initial removal request only included our adoptive daughters, not our biological sons. Upon review of the Order To Take Child(ren) Into Protective Custody after purchased at the court on December 11, 2008, it was found that the reasons listed by CPS to remove our daughters were false.

    - 3(a) states that there is physical abuse by the parents.

      - However the front page of the CPS report states: "No current injuries have been observed but it is reported that there have been injuries in the past."

      - The physician's assistant did not claim that the bruises were "consistent with abuse" until

November 5, 2008 when asked to alter the medical

records by DHS.

- 4(b) claims the "efforts" to keep the children in the home

  include:

  - Referral to ACES Counseling and Catholic Social

    Services for pre-adoptive assessment.

    - A referral to ACES Counseling did not exist.

      The Indiana worker asked if we would enlist

      the foster-to-adopt children in counseling.

      We were able to choose whichever agency

      we saw fit as we were granted this

      permission from Judge Weikert, Dubois

      Circuit Court, Indiana.  Counseling for the

      children commenced as soon as their

      insurance was activated, which was in

      September 2008.  This counseling was never

      cancelled by the Plaintiff.

    - As mentioned above, Plaintiff utilized DHS

      as their adoption facilitator.  After a "failed"

      placement in 2005 DHS requested that we

47

> attend counseling at Catholic Social
> Services to be sure that we had healed from
> the previous placement.  After a couple
> sessions we were released by the therapist.

It is evidenced that lies and deceit were presented to the court in an effort to take

our daughters away from our family.

- October 24, 2008: At our supervised family time the girls revealed that they
  had been to the doctor and received immunizations.  DHS was not aware of
  this visit and permission to administer immunizations was not granted by the
  parents.  Also, the girls had attended their annual physical with their regular
  pediatrician just a few months prior.  All immunizations were brought to
  date at that time.

  o CPS Linert made a point to be sure that the girls' belongings were
    brought to DHS immediately.  As of this date their belongings were
    not given to them and they were wearing rags that were inappropriate
    for the weather.  Linert reassured me after the visit that he would get
    their belongings to them that night.

- October 30, 2008

  o At this visit Nicole declares that she is in the JAZZ program at the
    new school.  This is program is basically study hall with available

tutoring.  Just 10 days prior, in her original school she was in mainstream classes getting A's and B's.  This drastic decline in grades proves just the opposite of the claims made by DHS.  There was stability in our home and chaos with no structure in the foster home.  This was also verify by statements made by DHS on December 5, 2008.  (audio)

- ○ After the visit, Heather Robinson, our original worker, informed of the hearing that was scheduled for November 6, 2008.  As of this time we were not aware of this hearing- the hearing that had the amended petition to take our sons as well.  Shortly after informing us of our rights as parents in the system and of the court hearing we received a different social worker.

- • October 31, 2008
  - ○ CPS Linert advised the referee that he was going to amend the petition to take the biological sons as well.  The referee asked if evidence that the biological children were abused and he was told there was not.  (CPS report, page 12)

- • November 4, 2008
  - ○ Daughters Sara and Nicole were taken to the Child Advocacy Center to be interrogated by Nicci Clive with CAC director Nancy

Szlezyngier, CPS Linert, adoption licenser worker Hutkowski,
Detective Titus and Assisting Prosecuting Attorney Hilary Buechler,
watching and posing questions through the two-way glass. The case
has not been adjudicated at this time. The Consulate's Office still has
not been informed that their citizen was being held hostage and
interrogated without any representation. The Guardian ad Litem was
not present at this interrogation, leaving the girls vulnerable to having
their rights violated.

o No criminal charges were brought against any member of our family
as a result of this illegal interrogation. This was 15 days after our
daughters were kidnapped and 2 days prior to the removal of our sons.

o DHS received copies of medical records at Port Huron Hospital for
the Indiana children, Nicole and Sara. As stated above, evidence of
proper legal authorization has never been presented granting DHS the
ability to obtain said documents.

- November 5, 2008

o DHS summoned Physician Assistant Brenda Leverenz and she
proceeded to alter the medical records to state "consistent with
abuse."

o We received a different social worker: Sara Meddaugh.

- November 6, 2008
  - Pretrial hearing in Attorney Referee Peter Shane Burleigh's court.
    - At this hearing CPS Linert was sworn in and questioned by the respondent parent's attorney. It was evident from the line of questions and answers that CPS Linert was lying about how and when he acquired the information that he was using to obtain jurisdiction of our children.
    - A plea of not guilty was maintained and a jury trial was requested due to the obvious bias of the court.
    - That evening at our weekly supervised family time at DHS, CPS Linert stated that he still did not have a physical pick-up order but that he planned on having one by the end of the night. This is curious. Our visits were generally held at 6:00 pm. The courts close at 5:00 or earlier. Which leads to the obvious question: If the referee accepted the amended petition before 1:00 pm and CPS Linert was at the courthouse at that time as he was the bringer of the charges, why didn't he take possession of a pick-up order while there during normal business hours?
    - Please refer to the corresponding date above for further details of the events of this day.

- November 12, 2008: supervised visit
  - At this visit we informed DHS of the perceived harassment the boys were receiving at school by a former foster placement.  This behavior from the child started after DHS interviewed her in regard to this case. Social/juvenile justice worker Sara Meddaugh advised that the boys may want to file a complaint with the local police in regard to the behavior. (audio transcript, pages 4-7)
  - DHS Meddaugh also stated: "Legally, right- legally we don't have wardship over them so…. If you give permission," (audio transcript, page 7) This statement proves that DHS was very much aware of the law and had total disregard for it and our rights.
  - "…the State of Michigan wants temporary custody of the kids.  We're not asking for permanent." (audio transcript, page 9)  Did the State of Michigan want temporary custody of our kids because we had 5 and the state would receive $4,000-$8,000 per month per child?
  - While discussing how our time with the boys would be handled, in regard to Thanksgiving, DHS Meddaugh said, "Thanksgiving- ok, I guess that's fine, I don't care… Football is fine.  What it is, is no direct contact, like one on one with you and Bobby by yourselves as long as somebody's around, somebody's supervising you guys-

football games, haircuts… doctor's appointments, like I said, you're more than welcome to go to the doctor's appointment with your children, these are your children, I don't want you guys not to participate in that kind of stuff." (audio recording transcript, page 14) Thanksgiving was again verified on page 15 by multiple parties.

- November 13, 2008
  - CPS Linert closed his investigation and placed the respondent parents on the Central Registry prior to a court trial.

- November 19, 2008
  - This day was Nathan's birthday. This birthday ended up being the worst of his life. DHS Meddaugh opened every gift and card prior to Nathan. Because of this policy the boys requested that we do not celebrate Christmas as a family if they were not home yet. They did not appreciate being treated like criminals.

- November 20, 2008
  - Robert called Supervisor Bonnie Bracken to have the girls checked on as they were not looking healthy at our visits.
  - DHS called the schools and requested the school personal conduct a visual inspection of the girls.

- CPS Linert called Robert's brother with the results of the inspection as he claimed that he could not find Robert's phone number. CPS Linert also took advantage of that phone call to inquire if Robert was still living at his house.
- Please refer above for other comments made this day during the conversation with me. (ransom demand and how he sees this case as only requiring counseling)

- November 21, 2008
  - Motion to Waive 63 Day Rule: this hearing was held as the court scheduled our trial on a date that our attorney had a planned vacation.
  - While waiting for the hearing to commence, CPS Linert again advised to change our plea to no contest and stated: "I didn't get that chance. You guys can give me your statements any time you want."
    - This was said 7 days after he closed his investigation. Any reasonable person would assume there would have been ample time to obtain the statements from the "perpetrators" in the 24 days the investigation was open. Not only could a meeting have been scheduled, we were at DHS weekly for supervised visits with our children. (A supervised visit is when the family is placed in a room with two way glass and the workers sit on

the other side and watch you.  The visits were supposed to be
an hour however our visits were generally 45 minutes or less as
the foster family was never on time.)

- o The hearing was postponed as the Court claimed certain parties were
  not served properly.

- November 22, 2008: We were allowed to move back home.

- November 24, 2008:

  - o The charges against Bobby were dismissed.

  - o Due to an injury at work and the amount of work missed by Robert,
    he was forced to find new employment.  He started his new job on this
    day.  Because of the dire circumstances Robert had to settle for this
    position and accept a $6 and hour pay cut, loss of accrued vacation
    and benefits and he also lost the potential six figure settlement for the
    injury he obtained at work March 28, 2008 (workman's compensation
    case).

- November 26, 2008

  - o At this visit DHS Meddaugh granted permission for the boys to come
    home as long as their grandpa came with them to help grind corn for
    the cattle.  (audio transcript, page 3)

- o DHS Meddaugh also asked the girls if they were attending church at the foster home, they said no but they wanted to go. (audio transcript, page 6)  The foster parents never took the girls to church as requested because they didn't attend.

- o Robert's parents continued to inquire about their foster license as the agency they were required to use would not return their phone calls. DHS Meddaugh apologized for all of the hoops they had to jump through but DHS had their licensing in the adoption unit and juvenile justice system revoked the previous Wednesday. (audio transcript, page 9)

- December 1, 2008: Hearing to Waive 63 Day Rule, granted.  Trial was scheduled for January 20, 2009.

- December 3, 2008

  - o Despite MCL 722.628 requiring the department to refer the case to law enforcement within 24 hours and the cooperation of the CIT, Detective Coleen Titus came to our home this day to interview the children.  She was surprised to learn that they had been removed for a month already.  Our attorney contacted her at a later time and scheduled the interviews for December 16, 2008 at the Sheriff Department.

- o DHS Meddaugh discussed the upcoming meeting with Supervisor Kim Irwin, herself, Robert and myself and scheduled our supervised family time for the Christmas season for December 22, 2008.

- o After this visit we inquired if we could go to the relative placement to spend Christmas with the boys. DHS Meddaugh denied our request and then denied granting permission for us to have Thanksgiving dinner there. "I didn't say they could go over there for Thanksgiving. (audio transcript, page 5) After we argued to the contrary, DHS Meddaugh said, "I don't ever- I don't remember saying that, so, no if that happened on Thanksgiving, I apologize if it was misinterpreted as that. There's not going to be Christmas, it'll be here at the DHS." Now, as you read in the above quotes, there was nothing to "misinterpret". DHS Meddaugh clearly granted permission for the parents to attend Thanksgiving dinner at the placement. This permission was giving more than once to multiple people, which leads to the assumption that we the parents were getting "strong armed" by DHS in order for us to change our plea to no contest. What better tool to use against parents to obtain your wish than withholding their children at Christmas?

- December 5, 2008

○ On this day there was a meeting with Supervisor Kim Irwin and DHS
Meddaugh.  The meeting was proposed to the parents as a time to
discuss moving both girls to relative placement with their brothers,
after the meeting commenced it was revealed that DHS wanted our
permission to enter the girls into therapy as they did not have legal
authority to do so.  We cited many reasons as to how that would
negatively affect the girls, this did not matter, DHS sent the girls to
therapy without court orders or administration of a psychological
evaluation.  When we asked whether they understand the law
Supervisor Irwin responded, "…we have to follow policy and law….I
do training on" (law and policy) (audio transcript, page 7).  This is a
disturbing trend: the employees of DHS admit to knowing the law and
policy and then proceed to violate the same.  This admission of the
knowledge of law and policy also removes any opportunity that may
have been awarded through governmental immunity.  DHS
employees, acting in both their official and individual capacities,
willingly and knowingly violate the rights of their victims.

  ▪ DHS Meddaugh: "…we're going to trial over **possible** abuse."
    (page 30)

- Denied the right to attend the intake session at therapy. Again, legal authority did not exist for this to take place and after we spoke with the therapist December 23, 2008 it was discovered that therapy had been administered as a tool to "glean" information from the girls to use against the parents in court.

- It was at this meeting that we were told we could go to the court and purchase the court orders up to that point as we had not received any legal documentation. (page 39)

- DHS Meddaugh provided copies of the petition. (page 42)

- Supervisor Irwin disclosed that a special investigation was being conducted by license worker DeBell and was surprised to learn that we had no knowledge of the investigation. (page68-69)

- PH: "And now she's 10:00 to 5:00 (sleeping). Ok, if she's sleeping all night in our home, she's not feeling abused. She's not afraid of anyone. She feels safe. That would tell me- that should tell you as foster workers that she feels safe. She's sleeping all night, she's not hoarding food and she's living- she's doing alright. Now's she's moved into the foster home she's hoarding food, she's a- you know doing all the other

things that she's doing- isn't that show that she's unstable and doesn't that prove that she was stable in our home and not being neglected?" DHS Meddaugh's answer: "Well, to some extent." (page 82)

- After much discussion how we have a structured environment and have researched the issues our adopted children faced, DHS Meddaugh claimed, "...she's going through a change from what she lived in to what now. There's you know maybe no- there- you guys- your houses were probably **very polar opposites**. So, you know how they're running their household is probably not the way you're running yo- ran yours." This statement is very disturbing and can be interpreted as an admission that the special needs children were in fact not being abused or neglected in our home. Children thrive when they feel safe and that safety was stolen from them when they were kidnapped and taken to the home of strangers.

- DHS Meddaugh gave the girls the option of where they wanted to live, they were 13 and 7. (page 93)

- The meeting concluded by DHS Meddaugh stating she was to schedule another meeting to discuss the possibility of placing

Sara with her brothers.  (page 97)  This placement meeting never occurred.

- December 16, 2008: the boys were interviewed by Detective Coleen Titus at the Saint Clair County Sheriff Department.

- December 19, 2008: Robert and I were interviewed by Detective Coleen Titus at the Saint Clair County Sheriff Department.  No criminal charges were filed and the Detective did **NOT** testify at our trial in July 2009.

- December 22, 2008

  o This was our supervised family Christmas at DHS.  Nicole did not attend this visit.  Despite the boys requesting to not receive gifts until they come home, we as parents could not do that.  This was the beginning of a very dark season.

  o After family time we were allowed to sit in the lobby of the counseling office while Sara received mental therapy.  Upon our arrival we presented two forms to the therapist asking her to acknowledge that she did not have legal authority for the services she was rendering.

  o At the request of the therapist, Sara's session was rescheduled and she asked to speak with us instead.

- During the course of the conversation, the therapist provided us with the contact information to the Children's Ombudsman in Lansing. She advised us to contact them and describe our situation.
- The entire night was civil and nonthreatening. (audio)

- December 23, 2008
  - We received notice from DHS Meddaugh that we were no longer allowed to attend our daughters' therapy sessions.
  - I called the Ombudsman's Office and spoke with Mike Roxberry. Mr. Roxberry opened a case on our behalf.

- December 25, 2008: As parents this was the darkest day of our lives. Despite being allowed to have special supervised time with the boys on Thanksgiving, for chores, sporting events, etc. we were denied that privilege for Christmas. Instead our day was spent driving the countryside and having dinner for two at Denny's. This was also the first time in their lives that our sons could not enjoy family traditions. Despite these drastic measures we stood steadfast and did not change our plea to no contest. We were innocent, and DHS knew that.

- December 29, 2008

- o Sara is showing signs of great distress. Her heart was broken because she asked Santa to take her home and he didn't. In fact, she wouldn't be back home for another year after this.

- January 5, 2009: I picked up copies of Nicole and Sara's medical records at Port Huron Hospital. The written statement of "consistent with abuse" added by PAC Levernez is **NOT** on these copies.

- January 7, 2009

  - o DHS Meddaugh will no longer be our worker. Our new worker is DHS Amy Sherrod.

- January 14, 2009

  - o I had a meeting with our attorney to discuss the upcoming trial. It looks bleak as the attorney has not interviewed any potential witnesses and trial is one week away.

  - o During our weekly supervised visit DHS Sherrod allowed Guardian ad Litem (GAL) Samantha Lord to have her very first interview with the boys. (This is one of many violations of her mandates under MCL 712.17d) The contempt of the GAL towards our sons can be heard in the audio recordings that our sons made. This was one more person who was mandated by law and took an oath to uphold the Constitution and the rights that it contains, that had opportunity to make a bad

circumstance right but failed to help the children in their dire situation.

- o It was again very obvious at this meeting that our daughters were being neglected in the foster home. They continue to come to visits looking and smelling as if they haven't washed in a long time, their clothes are rags that are inappropriate for the weather, despite the fact that their belongings were sent to them, their manners had diminished to the point that food wasn't being chewed, just swallowed, etc.

- o The boys are very upset, and voiced their feelings. We were not called up to the visit room until 5:20, they took the boys out one at a time and made us leave the visit at 5:55.

- o DHS Sherrod referenced information contained in the ISP (service plan). We had never been supplied a USP nor an ISP as required by DHS policy.

- January 15, 2009

  - o This day I had another preparatory meeting with our attorney. At this time it was unknown to us that he had made a deal with DHS and the Prosecutor. He still had not fully interviewed us nor spoken with any of our potential 130+ witnesses and trial was in five days.

- In exchange for a plea of responsible to the petition our sons would be returned that day and our daughters within a couple weeks.
- As we could see how the deck was stacked against us, we had no other choice but to accept the deal.
- In our plea hearing, we were denied our rights which lead to the eventual overturn of this plea on May 12, 2009.
- The boys returned home after school.
- Nicole was never returned home.
- Sara was not allowed to come home until December 14, 2009.
  - We had to accept the presence of Families First to monitor us daily in our home.  This was without a court order.
- Court orders were issued for services which included psychological evaluations for the parents, parenting classes, Bobby was required to take an anger management class, supply financial data on a bi-weekly basis, kids participate in individual therapy (girls had already been in therapy since November 2008), financial statement to be filed with the court, the court reserved the right to charge us for the care of our children, the boys were returned following the hearing and there was to be a 90 review, and DHS was to receive any government funding that should be giving to any of the children.

- Despite our financial status we were never required to pay for DHS to care for our children.
- The first psychological did not render the results that DHS wanted so we had to have another psychological at a different agency. The second evaluation netted the same results, we were stable and not in need of any further services.
  - The second report noted that the parents needed to be protected from Nicole. (court transcript, April 9, 2009 and evaluation)

- January 20, 2009
  - DHS Sherrod conducted the first interview with Robert and I.
    - The reports that DHS Sherrod was referencing stated that CPS Linert interviewed *all* of the children at school on October 20. This was not true, he did not go to the school, he came to the house. (transcript page 14)
    - DHS Sherrod states that "we don't have enough extensive foster parent training to deal with children who have been severely traumatized. Because it's, you know, just general nature to address the tip of the iceberg and with these kids it's not going to make a difference. It's what's underneath the

water that makes the difference.  You know, what's underneath there and people just don't know how to go outside of the box to deal with something like that." (pages 16 and 55)

- This statement basically confirms that DHS was fully aware of the typical behavior of the severely traumatized children that were in our home and that we were not the people who traumatized them.

■ DHS Sherrod: "She didn't know she was adopted?"  RH: "No"… "she, she doesn't even know that- now she knows that we're not her real parents."  DHS S: "So, now you guys discussed this with her or no?"  RH: "No… she, we can't talk to her." (pages 58 and 59)

- The trauma that DHS caused to Sara's soul has been irreparable.  If the law and policy would not have been disregarded, this great emotional pain would not have been experienced.

- The pain was made even greater due to the fact that DHS did not allow us any form of contact with Sara in which we could comfort her and explain the special journey we took to choose her and to make her our daughter.

67

- PH: "Well, I told the detective too, you know, like the day I had her (Nicole) teeth marks in my shoulder and riddled with bruises from kicking and punching- I didn't call the sheriff because how is the behavior ever going to stop if when she wants- you know, if her goal is to get out of the house, and I call the sheriff every time- guess what, it's going to get worse and worse and worse.." Sherrod: "It's a game for her" (page 71)

  - This statement again reinforces the fact that DHS is fully aware that the children who are placed in adoptive homes from the foster system have a lot of issues that are not the fault of the adoptive family. DHS had Nicole's dossier from Alabama and was fully aware that she lied to get her way.

- Sherrod: "Well, everyone's been traumatized. I think any child that has to be taken from their parental home has been traumatized."

  - This is an admittance that DHS is a violator of the very Child Protection Law they claim to uphold and that they are the abusers of the children. When DHS does NOT follow the law, policy or the Special Victims

Investigative Protocol they are thereby kidnapping every
child they take into their "care and custody", whether it is
legitimate abuse or not.  Every person, no matter their
social status, has the same rights granted to them under
the Constitution.

- Sherrod: "You guys sign for those?" (page 92)
  - This was in reference to the pictures taken of the children
    at the hospital by CPS Linert.
    - As there was no adjudication, court order or any
      other legal document, and we did not give
      permission for our children to be photographed,
      our rights were again violated.
- Sherrod: "I think it's more like, **when you are able to spin
  something** that you know, you have structure by a motivational
  stick.  Is what it is."  (page 100)
  - This statement of the tactics that were employed by DHS
    in the kidnapping of our children is appalling.  Laws have
    been written and adopted to protect the citizens from this
    very form of governmental overreach.

- This statement also explains why CPS Linert refused to interview the parents. If the other side of the story would have been told the "spin" would not have worked.

  - Sherrod: "…yeah, sure there's structure going on in your house because you've got a motivational stick and if you don't do what I say I'm going to beat you. That's where- that's where it looks criminal. **So, when you can sit down and explain this is,** you know, because as I said before there are, to understand the extent of trauma and what that does to children and how they, they function amidst trauma, um, you know, structure is important, um they need to have…" (page 100)

    - This is another instance in which DHS admits that if interviews would have been conducted as required by law we would have been in a very different situation.

    - If any actions in our household were considered criminal then law enforcement would have been involved within 24 hours as required by law and after witnessing or conducting her own interviews, Detective Titus would have brought those charges. **NO** charges were ever filed.

- Sherrod: "…**without hearing the whole story and what could have made sense**… I mean, so **when you are able to explain those things it looks, you know, different**. So, I mean that's why I wanted to discuss these things with you." (page 113)

- Sherrod: "…the kids will go home, we'll discuss I'm not opposed, I'm not totally saying I will never move Sara. I'm not saying that you know, I'll look into what's going on and determine what's in her best interest. And also, you know, I don't know if you guys have discussed it as a family, I mean, returning Nicole to the home or not. I mean you have to decide…." (page 113)

  - DHS representatives continuously suggested that we did not have to take Nicole back into our family. This is not something that we asked for at this time. Until Nicole started asking how deep she had to plunge a knife into our chest to kill us in August 2009, our goal was reunification. For DHS to constantly suggest otherwise insulted our familial integrity.

- Sherrod: "No, I didn't see anything from her." (page 115)

- This was in reference to Miss Ogden.  The Indiana supervisor was able to discuss the case with us as DHS supplied them with a document that stated Nicole told Miss Ogden that she was hit with a stick at home.

- This statement verifies that DHS supplied false documents to the State of Indiana and lied to them about the care of their children.

- Sherrod: "Normally, I'm not saying you, I just know that in doing this for the past seven years people generally plead no contest so it doesn't open it up to if you pleading guilty opening it up to being criminally charged." (page 118)

  - This statement proves that the normal operation of DHS is in direct violation of the law.  Children are being removed and parental rights terminated because the parents are strong armed into filing a plea of no contest with the promise of getting their children back.

- Sherrod: "**...the boys, I think um, whatever kind of deal they worked out with the prosecution,** as I said before, I'm just- I'm the foster care worker."  (page 120)

- This statement was an answer as to why the boys had different placement options from the girls.
- DHS said they had to remove the boys because "if it isn't safe for one, it isn't safe for any." Then the opposite is true: if it is safe for one, it is safe for them all.
- This statement also proves that there was a ransom demand for our children which is the very definition of kidnapping.

- January 28, 2009
  - At our visit we asked when we would be getting the referrals to therapy as it had already been two weeks and nothing had moved forward.
    - Sherrod: "Uh, yeah, what I want to do the assessments, see what comes back on that and, you know, you guys have never done any kind of, you know, therapy or, I'm not going to waste anyone's time, theirs or therapist's if it's not necessary. So, I, what I want to do is get the assessments done." (page 3)
    - Sara warned us that Nicole doesn't want to come home. (page 4)

- DHS Sherrod discussed moving the girls to their grandparents and granted permission for me to go to the relative placement daily after dinner. This would allow the girls and I to re-establish familial activities. (page 6)

- February 4, 2009
  - DHS Sherrod asked if Nicole was in special education while she was in our home. Nicole did not have any type of modified classwork while she was in our home. She maintained grades of C and above in mainstream classes. In fact, during the 2008 school year, prior to the kidnapping, she was earning straight A's.
    - Sherrod: "Cause the foster parent's like should we look at 5, 504 and I'm like (inaudible) we wouldn't need a 504." PH: "What's a 504? Like an IEP type deal?" Sherrod: "Well, they modify (inaudible) they give like half the work…" (page 2)

- February 9, 2009
  - Robert and I went to Community Counseling and Mentoring Services (CCMS) for a psychological evaluation administered by Dr. Kathleen Gutowski.

- February 11, 2009
  - This is our last supervised family time at the DHS building.

- o While riding in the elevator DHS Sherrod tells us how DHS has an aerobic instructor for the workers in the basement of their three story building. (page 1) We found this to be odd as the DHS offices of counties with triple the population rent office space for their operations and are generally located in strip malls. Is Saint Clair County DHS able to build and maintain a three story building because they illegally remove so many children? They are paid $4,000-$8,000 per child, per month after all.

- o DHS Sherrod asks the girls if they would like to go live with their grandparents- the ones that live next door. Both girls say yes. (page 1)

- February 17, 2009

  - o Nicole and Sara were moved to relative placement.

- March 4, 2009

  - o There was a Foster Review Board Hearing as the foster home filed a grievance against DHS for not filing a piece of paper at the proper time.

    - ▪ This Board determined that there were concerns with the girls' placement at the foster home and they should not go back there but the move to relative placement was premature.

- Despite the Board's concern with Nicole in this home, DHS allowed them to adopt her shortly after we requested to relinquish our parental rights to her in August 2009.

- March 9, 2009
  - Dr. Gutowski requested a meeting with Bobby (age 15) as the information that she was provided by DHS did not match the statements that were given by his parents. She wanted to meet with him for clarification.
  - Shortly after this meeting DHS informed us that our psychological evaluations would not be completed because the psychiatrist no longer worked at CCMS therefore we would need to submit to another.

- March 16, 2009
  - Foster Review Board Hearing in Judge Brown's court. (transcript and audio available)
  - Robert and I release our attorney prior to this hearing and represent ourselves in court.
  - Judge Brown allowed the girls to stay in relative placement as the reason the foster family appealed was a simple paperwork issue and there were no concerns of possible abuse.

- After the hearing the foster father (John) and his brother (Uncle Billy) shook our hands, stating that this was nothing personal and we had a sweet daughter (Nicole).

  - After the girls moved into relative placement it was noticed that Nicole exhibited odd posture and an uncanny obsession with Uncle Billy, it was suspected that she had a sexual relationship with him. DHS Sherrod suggested that Nicole submit to a full body scan in order to protect the parents from future accusations. We agreed. This scan was never administered.

  - Due to the reaction and statements made by Robert to DHS Sherrod and Meddaugh after John and Billy walked away, DHS Meddaugh filed a 3200 against Billy, opening a CPS investigation for a possible sexual relationship with Nicole.

- March 28, 2009
  - Robert and I submit to another psychological evaluation at Eastern Michigan Counseling by Dianna Pratt.

- April 9, 2009
  - DHS Nancy Stanek, Macomb County came to our home to interview us in regard to the accusations with Billy and Nicole.
  - 90 Day Review Hearing

- Sherrod: "…I did receive those psychological reports last night…. I have reviewed them and the recommendations were not for further services for the Harndens.  The recommendation is that **Nicole** Harnden **submit to a psychological assay in order to protect the parents** so to speak." (court transcript, page 6, lines 5-12)

- Parenting classes were removed from our court orders as further services were not recommended by the therapist. (court transcript, page 9, lines 13-21)

- DHS Melisa Hazen became our new worker and DHS Sherrod became a CPS supervisor.  (personal transcript, page 2)

  - CPS Supervisors are allowed to go into the judge's chambers prior to hearings.

- Sherrod: "Everything that could go wrong has gone wrong." (page 4)

- Sherrod: "…keep going as fast as possible, even some you know unsupervised visits then you know start some overnights then they go home then it stays open for another three months. So, but like I said, the psychological evaluation wasn't a lot in there but I mean the two recommendations were you know that

um Nicole- that Nicole have testing done to further protect you
from this happening again." (page 6)

- While speaking with our new attorney DHS Sherrod
  acknowledged that she spoke with us in the past in regard to
  filing in court for a new trial. (page 8) Sherrod: "well, we talked
  about a misrepresentation, yeah."

- Sherrod: "**Bottom line you know clearly is that you know the
  boys are fine at home, why are the girls not?**" (page 8)

- Sherrod: "And Nicole's um, you know going to make it as bad
  as she can until she gets over and moves on to the next thing."
  (page 9)

  - Representatives of DHS are continually admitting that
    the parents were not the problem, yet they refused to do
    what was right: go to court, close the case and give us our
    children back.

- April 19, 2009

  o Meeting at DHS with CPS Blaine Goul and his supervisor Sue
    Mulburg.  We were invited to this meeting to address the issues
    uncovered by the investigation into Uncle Billy.

- We were asked if Nicole required special services as she was displaying behaviors that indicated such.  We informed him that she did not.

- The investigation found that there was definitely an inappropriate relationship between Billy and Nicole however since the girls would not disclose the details they could not move forward with charges against him.

- Detective Titus was involved in the investigation.

- This case brought even more questions from Robert and me. DHS had no formal or legal complaints against our house, no investigation or due process yet our children were removed from our care.  The Collins foster home investigation displayed abuse of our children and no charges, court hearings or removal of children for them.  What method does DHS use to determine which family they are going to award their rights to?

- May 2 & 9, 2009
    - Nicole had her psychological evaluation completed by Dianna Pratt.

- May 12, 2009

- o Robert and I filed a motion to withdraw our plea of responsible. Due to the violation of our rights during the plea hearing, Judge Brown granted our motion. Jury trial was scheduled for June 24, 2009.

- o Attorney Biretta: "They're leaving them where they are right now. As a matter of fact in thirty days they're going to give you back Nicole and Sara.." PH: "They said they were going to give the girls back in thirty days?" AB: "Less than thirty days."

    - ▪ Mr. Biretta was given this promise from Prosecutor John Walke during their meetings before and after the hearing. This was another empty promise made in attempt to strong arm us to comply with the wishes of DHS.

- • June 16, 2009

    - o Prosecutor Walke filed a motion to allow the courtesy worker DHS Dalrymple to testify to a statement allegedly made by the Indiana girl who was under the age of 10, while in her proximity at the airport and a second motion was filed, Motion in Limine, that would only allow the defense to use evidence prior to October 19, 2008, which was one day prior to the CPS report.

        - ▪ Judge Brown allowed the hearsay testimony that would be used to take jurisdiction of our children and Prosecutor Walke did

not proceed with the motion that would limit our defense. (trial

transcript)

- June 22, 2009
  - There was a review hearing in Attorney Referee Burleigh's
    courtroom.  The Referee stated that this hearing should have been
    canceled as the plea had been reversed therefore the court could not
    give orders.
- June 23, 2009
  - GAL Lord filed a motion to be removed as the GAL for the boys but
    remain GAL for the girls.
    - Motion granted.
    - This meant the boys would not have proper representation at
      the trial scheduled for the next day.
- June 24, 2009
  - Trial was rescheduled as there was another trial proceeding upon our
    arrival at court that morning.  Trial was rescheduled for July 21, 2009.
  - DHS scheduled a Team Decision Meeting for 9:00 am.  This TDM
    was to discuss the possibility of removing the girls from relative
    placement to a licensed foster home.

- o Shortly after the girls were moved into relative care in February, upon the advisement of DHS Sherrod and our attorney, we video recorded our conversation with Nicole about her experiences in the foster home.  This was done so that we could have an understanding in order to help her heal and reunify with our family.  DHS did not have concerns with this action until after our plea was removed and we were once again going to trial.

  - This raises a question: How did DHS know that they would be able to schedule this meeting if trial was scheduled for the whole day?

  - Please remember that on May 12 the Prosecutor informed our attorney that the girls would be home within 30 days.

  - As our psychological evaluations show no need for services or concerns with our family, DHS could not show threat of harm or prove abuse in our home at the trial.  The evidence trail leads to another conspiracy with the court to delay our day in court in order to give DHS adequate time to conceive another "case" to justify the seizure of our children eight months previous.

- o A few highlights of heinous statements made by DHS from our audio recording:

- It was disclosed that CPS had opened another case against us. They were claiming that we emotionally abused Nicole because she cried when we asked her questions about her experience in the foster system since October.
  - This is another example that DHS was actively pursuing the termination of our rights to our girls.
  - PH: "Uh, we found out in court- actually we found out when- the girls.  Sara came home and said that- that she thought she was getting taken away from us again." (page 11)
    - When Sara was moved into relative placement she had to be driven to and from school for the first week as she was having panic attacks.  She was deathly afraid that she was going to be kidnapped from the bus again.  This new baseless CPS investigation (no reporting person) drove her deeper into her fears.  She was seven years old.
- Dianna Pratt (DP), psychiatrist: "I just have some concerns about Nicole going home.  **Not with the home but she wants things the way she wants them and when things are out of**

**her control, she becomes incredibly agitated and very**

**violent.**" (page 5)

- Supervisor Chiquita Ford-White (CFW): "We do have

  jurisdiction to talk to children at school- period.  As soon as it's

  assigned" (page 12)

> MCL 722.628(8) A school or other institution shall
> cooperate with the department during an investigation of a
> report of child abuse or neglect.  Cooperation includes
> allowing access to the child without parental consent if
> access is determined by the department to be necessary to
> complete the investigation or to prevent abuse or neglect of
> the child.  The department shall notify the person
> responsible for the child's health or welfare about the
> department's contact with the child at the time or as soon
> afterward as the person can be reached.  The department
> may delay the notice if the notice would compromise the
> safety of the child or child's siblings or the integrity of the
> investigation, but only for the time 1 of these conditions
> exists.
> (9) If the department has contact with a child in a school, all
> of the following apply:
> (a) Before contact with the child, the department investigator
> shall review with the designated school staff person the
> department's responsibilities under this act and the
> investigation procedure.
> (b) After contact with the child, the department investigator
> shall meet with the designated school staff person and the
> child about the response the department will take as a result
> of contact with the child.  The department may also meet
> with the designated school staff person without the child
> present and share additional information the investigator
> determines may be shared subject to the confidentiality
> provisions of this act.

(c) Lack of cooperation by the school does not relieve or prevent the department from proceeding with its responsibilities under this act.

- The law is pretty clear that there are stipulations to be met to allow such access.  As we have not been provided a copy of this CPS report, we do not possess the information as to whether law was indeed followed.  As the law was not followed in previous cases it is assumed to be violated in this case as well.

- At the time of this "investigation" our daughters were in relative care which granted CPS in-county access to the girls.

- As stated above, the school is located in Sanilac County therefore Saint Clair County DHS does not have legal authority to enter the premises.

- The GAL was not present during this interrogation.

- The Ukrainian Consulate was not notified that their citizen was going to be assaulted at school- again.

- ○ Once again, the girls were left without legal
  representation contrary to all laws, protocols and
  policies.

- • An officer of the law was not present during this
  interrogation.

▪ CFW: "..what we can do is answer questions as far as our
continuous concerns and you said that you know, **that you're
working and you guys still haven't go your kids back AND
SOME OF THAT IS NOT JUST BECAUSE UM <u>WE
DON'T WANT TO GIVE THEM BACK</u>…"** (page 13)

- • For clarification, you read that correctly: DHS was not
  giving us our children back because they did not want
  too.  Not because we were abusive.  Not because we
  neglected our children.  Simply because they did not
  want too.  This is blatant admission of kidnapping and
  holding our children hostage.

RH: "At least, I, I understand that you have to run an investigation,
that's fine, but at least you could have had told my mother and she
could have been there to support her. (Sara)" (referring to the
questioning at the school)

CPS Christy Moses (CM): "We don't have anyone there.  I, **I was asked to wait until after I talked to the girls to see if there was** (inaudible).  And then if there was we would go from there."

- Further substantiation that DHS premeditated the continued and unwarranted abuse of our family.

CFW: "…we need to progress in the case which like I said before we're at a standstill because of the court and I understand you guys have followed through with *court orders* and have- *is there anything left that they need to do*?"

MH: "**No**."

CFW: "…when the kids do come home, because of Nicole's history, there's going to be new allegations and new protective services investigations and our concern is how you handle that." (page 39)

- Another admission that the parents were not the abusers in the home and the court orders were complete.

▪ Pages 47-48 discuss how the situation became what it was because the adult CPS worker bought the lie that the 13 year

old former foster child told.  DHS on more than one

occasion declared that they do not care that she lied, they

were keeping our daughters.

- CFW: "And, and you know what- and it's not that it looks

  better for our case (not allowing more than 8 hours of

  unsupervised visitation time on the weekend), it's that we're

  stuck at a stage.  We usually have the normal process:

  adjudication, then a process to go toward reunification."

  (page 71)

  - As demonstrated above, that normal process is the

    "uneducated, unemployed people" pay the ransom

    demand at the first court hearing.  They plead no

    contest because DHS describes this action as: they

    (DHS) aren't responsible for anything and you "aren't

    guilty" but you're treated as guilty.  However if there

    are future court hearings this plea cannot be used

    against either party.

    - The constant demand to plead no contest shows

      a well-planned conspiracy in which DHS uses

      the protection of the no contest plea to ward off

any liability suits. This would also suggest that DHS is aware that if a family were able to bring civil action against them the suit would proceed due to the fact that gross negligence is open and obvious thereby removing any immunities they would normally be afforded under the law.

- Supervisor Kim Irwin (KI): "Well, I'm going to tell you right now you can tell him. The kids aren't going to go home before trial." (page 76)

  o Another statement to prove that our children were being used as pawns to extort a plea of no contest to avoid trial.

- RH: "No, no one ever talks to us." CFW: "…Probably because they're being taped and whatever- you're right. You're absolutely right." (page 77) and again CFW: "Lucky you. That's why people don't talk to you. I'm going to tell you, right up front. That's why people don't talk to you." (page 79)

  o This response proves that DHS was aware that we recorded our conversations.

- o It also shows that DHS was willingly violating our rights as they did not want to be recorded. People who conduct honest business are not afraid of a recording device.

    - The meeting ended with permission to have unsupervised visits all day Saturday and Sunday. The CPS investigation that brought this meeting was nulled.

June 26, 2009

- o The Office of Children's Ombudsman closed the investigative case prior to the children being returned home, leaving them vulnerable to further unchecked abuses.

July 21, 2009

- o Jury trial

    - The jury trial provides evidence of the numerous violations against our family by DHS. A brief review of the transcript will reveal: lack of due process by all parties mandated by law to conduct the investigation, an accuser did not testify against us, hearsay evidence was used to gain jurisdiction of our children, the detective that was involved in multiple interviews of the children and parents neither brought criminal charges nor testified, CPS and

the sheriff deputy committed perjury (substantiated by FBI), the respondent father was not allowed to testify and multiple other violations too numerous to mention.

- As we were not allowed to call any witnesses other than ourselves, we had to provide legally admissible evidence despite the prosecution being allowed to use hearsay, the jury reached the obvious conclusion: guilty.

  - When we took our case to the FBI, they were stunned that we would come into their office with the documents and court orders.  The documents make us look like monsters, however, after a brief interview the two agents realized that we were the victims of a corrupt system and were not the monsters that were portrayed.  Guilty people do not take that kind of paperwork to a federal officer for fear of being arrested.

  - During the dispositional phase of the trial CPS Linert presented the court with the exact same services that we had already completed between January and July 2009.  This can be verified by review of the June 24, 2009 transcript of the TDM that was discussed above.

- Despite the Court advising CPS to submit different recommendations, the Court ordered the repeat services.

- Therefore we were subjected to another psychological evaluation (third in less than 6 months), 8 week parenting classes (Just as with the first two evaluations, further services were not recommended therefore these classes should have once again been removed.  During one of our classes the instructor admitted that she knows what DHS and the Judge want on their reports so since we would not admit to what they claimed as truth she could not give us a positive review- don't forget, this is parenting class, not therapy.) all of which meant that Robert would continue to miss even more days of work continuing to place his employment in jeopardy.

The month after trial:

- After Nicole realized that DHS was proceeding with placing her back in our home against their promise to her, her acting out behaviors intensified:  She started to closed fist punch our sons in the face, to ask

93

how deep she needed to plunge a knife in our chest to kill us, she stated that she knew the mistakes she made the first time and she wouldn't make them again, she would take our sons away from us for good because DHS believes her and not us, caused physical harm to Sara in relative care on multiple occasions, had Sara pack her bags so she could run away with her, told Sara that Grandpa was going to shoot her, bury her and have the dog poop on her grave, etc.

o After much deliberation, on August 11, 2009 we finally accepted DHS' offer to call them if we decided that reunification with Nicole would not be in the best interest of the family.

- This decision came with a roller coaster of emotions. When we started to pursue adoptions we understood that there would be challenges but that the end result was worth it: a child has a place to call home, a family for holiday celebrations and an opportunity to experience unconditional love. The illegal actions of DHS and their co-conspirators have stripped that from our family. This was a gross violation of our familial integrity.

- August 14, 2009: CPS Sherrod facilitated our parental rights relinquishment hearing in Judge Brown's court.

o September 1, 2009

- Robert and I submit to another psychological evaluation with Dr.
  Lamb. No concerns or pathologies noted.

o September 9, 2009
- The boys were evaluated by Dianna Pratt. Dr. Pratt had no
  concerns for the boys and determined they did not require any type
  of services.

o September: Robert and I started parenting classes.
- The parenting classes were conducted in an instructional group
  setting. The instructor/co-founder made a few concerning
  statements. A few are: She knows what the Judge wants in his
  report, she bragged that she was recommending termination of five
  of the eight people in the group, participants were "graded" by
  their body language in class, etc. These meetings are available on
  audio for verification.

September 18, 2009:

o I called DHS Ford-White inquiring whether she had an answer to an
  email that was sent to DHS Hazen in regard to DHS recommending
  the Court remove our parenting classes as again they were not
  recommended by the psychiatrist. She stated that she did not have a
  chance to go through the email however some new concerns came to

the office that we were unaware of.  DHS Ford-White: "There were

some allegations that you all went to the school with the paperwork

and made the school feel real uncomfortable, about the um the

original petition, the original referral or something like that." PH: "I

didn't take any paperwork up there." … PH: "Yeah, I understand that

but nobody said anything to me so I can't defend us if I don't know."

DHS Ford-White: "Ok, no, I, I know that.  I know that.  Well, I don't

know what the school said to you when you guys went up there **I'm**

**assuming** it was referencing the paperwork, um…"

- ▪ This is another example how DHS conducts business.  They
  were forcing services, not answering emails or phone calls and
  withholding our children because they "assume" but never ask
  for the facts of the situation.

o PH: {crying} "I know, I know that, and, and that's what was in my

email was I will miss every single game of my son's eighth grade

football season because the classes are Tuesday nights at 4:30 to 6:30.

And his games are at 4:30 and that's not fair and that's not right it's

the same class the DHS said we didn't need in April.  If we didn't

need it in April then why do we need it now?"

- ▪ This violates our family's pursuit of life, liberty and happiness.

October 9, 2009

- ○ We filed a motion to ask the court to remove the parenting classes as further services were not recommended on any of the three psychological evaluations.
    - Prosecutor John Walke: "…Ms. Hazen is in a position where she does believe they're (parenting classes) helpful but doesn't necessarily view it as essential to the current reunification plan that she has in place for the children." (court transcript, page 8, lines 10-14)
        - DHS does not believe we require parenting classes, our sons are already home, however they left it up to the judge to decide whether the classes continued. This is another example of the abuse we endured.
    - The motion was denied and the Judge threatened that if Robert and I do not admit to inappropriate discipline then he will never put Sara back in our home.
        - It is still not understood why after being found guilty in the rigged trial why we would be required to file a separate plea with this judge. The only conclusion is that the judge is a co-conspirator with DHS in the kidnapping of the children and was working to tie up loose ends in an effort to make sure the

paperwork was in order.  A perfect example of post-deprivation measures trying to justify pre-deprivation violations.

- ▪ After this hearing our attorney informed us that Saint Clair County DHS Director Elreta Dodds was no longer the director.  She was moved to Wayne County as discipline since she is the one that put the pressure on DHS to take our case to court. (personal transcript, page 13)

October 14, 2009

- o DHS Hazen sent an email that stated Sara would now need to go in for a psychological evaluation and that due to the judge's words on October 9 she would no longer be attempting to move Sara home until we admit responsibility of our actions: inappropriate discipline.
  - ▪ This is a good time to remind the reader that ten months earlier, as a part of the ransom demand, it was promised that Sara would be home within a few weeks.  This promise had been made more times than can be counted.
- o Due to the continued manipulation, lies and abuse by DHS, our attorney stated, "I will stand by yours and Bobs side without charge for the remainder of this s**t." (email)

October 15, 2009

- o Compliance Conference: This conference was convened by the Michigan Department of Human Services Bureau of Children and Adult Licensing in regard to the "violations" on our foster license.  In attendance was: Facilitator Kelly Maltby, DHS License worker Marnie DeBell, DHS adoption licenser Jennifer Hutkowski, CPS Joseph Linert, Robert and myself.

  - Robert directly asked Ms. Maltby if we should have gone to trial or lost our children: she said no.  Ms. Maltby went as far as to say that our foster license would not have even been revoked over the fabrications submitted by DHS. (personal transcript, page 16)

  - We were found innocent of all charges brought by DHS DeBell to the State.  It should be noted that DHS DeBell's report was for the most part a copied and pasted version of CPS Linert's report used to take our children away.  Ms. Maltby stated that the accusations were so ludicrous she knew that we were innocent.  Yet here we were six days shy of having our family torn apart for one year and still no hope of reunification.

  - Our license was administratively closed due to the fact we were on the Central Registry.

October 19, 2009

- o Permanency planning hearing held in Attorney Referee Peter Shane Burleigh's court: This is the hearing that was referenced during the October 9 hearing in which it was stated DHS had planned to release the boys as wards and place Sara back in our home. Instead, DHS used Judge Brown's words to keep our children as wards that much longer. As a bonus to DHS, they would continue to collect $4,000-$8,000 a month per child.

October 21, 2009

- o Received an email from our attorney with wording that would "admit responsibility" in order to satisfy the demands of the court to get our kids back.
  - ▪ The statement suggested by our attorney was copied and pasted then emailed to DHS Hazen.

October 22 and 30, 2009

- o Sara was evaluated by Dianna Pratt. No further services were needed.

December 14, 2009

- o Permanency Planning Hearing in Judge Brown's court.
  - ▪ It was recommended that the boys be dismissed as temporary Court wards and Sara be returned home with Families First Services.

- The court did dismiss the boys and place Sara home however the Court did not order Families First into our home to supervise us.
- In a conversation with DHS Ford-White after the hearing she stated that Families First would only be in the home to monitor Sara and me to be sure that I was not overwhelmed anymore. (audio)

December 16, 2009

o Jason from Families First started in-home services despite the lack of court orders, recommendation from any of the psychological reports and the fact that even the prosecutor said they could not prove threat of harm back in June 2009.

- During the first visit Jason stated that his supervisor told him this would be an easy case and should only be open a few days. As time went on DHS would not allow Families First to close our case despite the lack of concern in our home. Audio is available for verification.

December 22, 2009

o It is alleged by DHS that Nicole was seeing therapist Jeff Frasier and that she disclosed that Robert twisted her breasts and pulled her pubic hair, therefore DHS opened a new CPS case against us.

- This was 4 months after our parental rights were relinquished.

- When contacted by CPS on this day, Jason stated there were no concerns about our home.  (CPS report, page 5)

December 23, 2009

- o Detective Colleen Titus and CPS Jennifer Henderson went to the foster home of John and Karen Collins and interviewed Nicole in regard to the "new" allegations of sexual abuse.  (CPS report, page 5)

  - DHS was advised in March 2009 by the Foster Review Board that neither of the girls should be placed back in the Collin's home due to obvious wrong doing.

  - The CPS report against the Collins home in April 2009 found that there was an inappropriate relationship between the adult male (23) and the minor child (13).

  - Nicole was eventually adopted by the Collins.

- o Nicole claimed that these sexual abuse acts happened prior to the original case handled by CPS Linert in October 2008.

  - This case is an obvious farce.  While a member of our family Nicole had regular physicals with her pediatrician, was around mandatory reporters 5-7 days a week.  If there was an actual issue of sexual abuse

it would have been exposed and discussed in the first case (which was still open).

- This bogus case also exemplifies the lengths to which DHS will go to have their way.  If a flow chart were to be made of the actions taken against our family it would be easy to see the abuse and the intent to take our adopted daughters away from us.

- Prior to the original kidnapping, the State of Michigan was not receiving any type of funding for the adopted children in our home. The State of Alabama received the federal money for Nicole and Sara was an international adoption with no funding sources.  After the illegal seizure of our daughters, in accordance to court orders, DHS became the receiver of any government funding that would be associated with the children.

  - At that time if Sara would have remained a ward of any type, the State of Michigan would have received in excess of $1,152,000.  (12 years in the system x 12 months/year = 144 months x $8,000/month) They did make up to $496,000 for gaining custody of Nicole. (62 months in the system x $8,000/month) Our daughters were just a dollar signs with a lot

of numbers after it. At no point did DHS have the well-being of the children on their agenda.

- It is alleged that Detective Titus advised CPS Henderson not to inform the family of the charges until after the CAC interview.

December 29, 2009

o At the advice of Detective Titus, Nicole was taken to the Child Advocacy Center to make her disclosures.

- Nicole claimed that all of this sexual abuse happened the day before she was removed from our home, which was October 19, 2008.

    - Per CPS Linert's demand the children were taken to the hospital for a well-child check, as discussed above.

    - Even the altered medical records do not reflect any form or mention of sexual abuse.

- Detective Titus declared that what Nicole described was not criminal in action but could be considered inappropriate discipline. (CPS report, page 6) Therefore, no criminal charges were filed.

- Prosecutor Walke also did not believe that the disclosure was sexual and advised that the current DHS worker Hazen update the court at the next hearing. (CPS report, pages 6 & 7)

- As the Prosecutor is the leader of the CIT, he is the one who is supposed to determine the course of a case.
  - A case conference held by Kathryn Kierzkowski, Ford-White, Linert and Henderson determined that CPS Henderson "would not be looking at sexual abuse, but inappropriate discipline." (CPS report, page 7)  This amounts to nothing less than double jeopardy.

January 4, 2010

- o Despite the advice of the Prosecutor, CPS Henderson continued her investigation.  On this day Saint Clair County CPS Henderson went to Sanilac County schools and interrogated our children without legal authority.
  - This interrogation method again struck terror into Sara's soul.  She came home terrified that she was going to be taken away again.
  - Both Nathan and Sara asked for their parents to be present during the interviews.
  - CPS Henderson contacted me to schedule a time for an interview at our home.

January 6, 2010

- o In attendance for the interview: CPS Henderson and Goul, Greg (Robert's brother), Robert and me.  This interview was also video and audio recorded.

- As can be verified by viewing the video: CPS Henderson continuously changed the charges as her accusations were proven incorrect, CPS Goul stated that the abuse of our family is coming from "higher up", CPS Henderson's report does not accurately reflect the happenings in the home during this visit, etc.

- CPS again contacted Jason at Families First. He stated "that the parents present as kind to him and demonstrated normal interactions with the children." And that he planned to close the case January 12, 2010. (CPS report, page 9)

January 11, 2010

- CPS Henderson contacted the relative care providers and asked how Nicole was in their care and specifically about a notebook that Nicole kept while there. This notebook can be observed in the video. DHS was made aware of this notebook when it was found in the spring of 2009 shortly after being placed in relative care. In this notebook Nicole discussed having sex with a boy at school- during school, she described how she would enjoy watching this boy beat up another boy, and multiple other concerning statements. In fact, this notebook was taken to the June 24, 2009 TDM and reviewed by DHS Hazen and Ford-White. DHS was fully aware that Nicole had an

inappropriate obsession with sex after leaving the Collins' foster home and prior to the July 21, 2009 trial.

o   Supervisor Deb Walbeq informed CPS Henderson that she would contact Prosecutor Walke in regard to filing a petition for sexual abuse allegations. (CPS report, page 9)

o   Robert and I went to the FBI office in Macomb County.  We presented them with the few documents and audio recordings we felt were relevant to the allegations we were taking to them: kidnapping, perjury by CPS Linert and Sheriff Deputy Randall Gobeyn and wrong-doing in the court.

    ▪   After a brief investigation all of our claims were substantiated and the FBI opened a case then made a referral to the Michigan State Police Department.

January 12, 2010

o   Families First closed our case without any concerns or recommendations.

January 13, 2010

o   Another case conference was held at DHS.  Contrary to the Prosecutor's advice, DHS would be filing a petition to terminate our rights to Sara for threatened harm, however she was to remain in the home.  The boys were not to be included in this petition.  "Robert will be substantiated for sexual

abuse of Nicole and Pamela will be substantiated for failing to protect

Nicole.  Sara will be a victim of threatened harm." (CPS report, page 10)

- This is blatant premeditation.  DHS has planned the further demise

  and abuse of our family.  The game plan has been made.

o CPS Henderson called to inform me of the court hearing the following day.

January 14, 2010

o Preliminary Hearing

- We cannot afford to retain Mr. Biretta for another case therefore we

  are representing ourselves.  (He is still pro bono on 08-497)

  - This was another way to "put the squeeze" our family.  DHS

    filed this second Category 1 case against our family without

    following any protocols or law, because it is a new case our pro

    bono attorney was allowed by the court to be removed from the

    new case and then appointed us a court appointed attorney, then

    the court assigned the new case the old case number: 08-497.

    Despite the attorney representing us pro bono, and the original

    case was still open, we were left without representation on the

    first case during the final few hearings.  The conspiracy

    between the court and DHS is open and obvious.

- We are in Attorney Referee Peter Shane Burleigh's court.

- The petition only has Sara's name on it despite the fact that the boys are in the home as well and DHS is pursuing sexual abuse.

- The petition also asks the court to take temporary custody and to terminate the parental rights of both parents.

- Referee: "So the Court is authorizing the petition and finding probable cause. Obviously, conflicting evidence would be resolved in a trial" (trial transcript, page 10, lines 10-12)

- CPS Henderson: "…that in home services to address the issue continue and be extended by the Court's order; and that the Court does not proceed to terminate as long as the parents can show benefit from the services provided through the current foster care case." (trial transcript, page 11, lines 1-5)

  o It is believed that DHS specifically requested an order of the court for the in home services because they did not receive an order for the original time. Another attempt to fix mistakes they made.

- Referee: "All right. Well, you know, and that will be something that, **if the case gets adjudicated**, will then be decided as to what type or if any services would be- that's not

something that we're gonna decide right now." (trial transcript, page 11, lines 12-15, emphasis added)

- Referee: "All right. Well, again, that would be determined once the case is adjudicated, if it is, in terms of what services would be appropriate." (trial transcript, page 12, lines 2-4)

- Petition accepted as predicted by the members of the case conference.

- Shortly after we returned home from the hearing CPS Henderson called: "That's just to say, just to be honest and open with you if we didn't, if we weren't able to put a service in then we couldn't say that Sara's safe and, and Sara couldn't stay in the home." (personal transcript, page 1)

- I again reiterated that we had a safety plan in place and the Robert was never alone with any foster/adoptive child per the PRIDE training we received through DHS.

- CPS Henderson, describing what happens at the upcoming pretrial: "…A pretrial is a time to either, you know, give your statements, of, um, you know, whether you accept the responsibility or you don't or you know the no contest…" (page 8)